RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED Y-Y
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _2-13-04_

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PETER KALTMAN, on behalf of himself and all
others similarly situated,

  Plaintiff,

vs.

SONUS NETWORKS, INC., RUBEN
GRUBER, HASSAN AHMED, and STEPHEN
NILL,

  Defendants.

CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED

**04 CV 10309 DPW**
MAGISTRATE JUDGE _Bowler_

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the

following upon the investigation of counsel, except for those allegations pertaining to plaintiff, which are

based on personal knowledge:

## NATURE OF THE ACTION

1.    Plaintiff brings this action as a class action on behalf of a class consisting of

plaintiff and all other purchasers of Sonus Networks, Inc. ("Sonus" or the "Company") securities on the

open market during the period June 5, 2003 through February 11, 2004, inclusive (the "Class" and

"Class Period," respectively), to recover damages caused to the Class by defendants' violations of the

federal securities laws.

## JURISDICTION AND VENUE

2.    This action arises under §§10(b) and 20 of the Securities Exchange Act of

1934 (the "1934 Act"), 15 U.S.C. §§78j(b) and 78t, and the rules and regulations promulgated

Doc#: 140253 Ver#:1 9730:0294

thereunder, including Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R.

240.10b-5. Jurisdiction is based upon §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

3.      Venue is proper in this District because many of the acts complained of,

including the dissemination of materially false and misleading statements and reports, prepared by or

with the participation, acquiescence, encouragement, cooperation, or assistance of defendants,

occurred, at least in part, in this District. Additionally, defendant Sonus maintains its principal executive

offices within this District.

4.      In connection with the acts and conduct complained of, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate

telephone communications, and the facilities of the national securities exchanges.

## THE PARTIES

5.      Plaintiff Peter Kaltman purchased Sonus common stock, as set forth in the certification

filed herewith, at artificially inflated prices during the Class Period and was damaged as a result thereof.

6.      Defendant Sonus is a Delaware corporation with its principal offices located at 5

Carlisle Road, Westford, Massachusetts 01886. The Company purports that it provides voice

infrastructure products, and that its hardware and software enables customers to deploy an "integrated,

packet-based network," carrying both voice and data traffic. Sonus markets its products to service

providers, including long-distance carriers, wholesale carriers, Internet service providers, and cable

operators. Sonus' securities are publicly traded on the NASDAQ National Market ("NASDAQ").

As of October 31, 2003, there were approximately 244,452,000 outstanding shares of the Company's

common stock.

7. Defendant Ruben Gruber, the founder of Sonus, is and was at all relevant times during the Class Period, Chairman of the Company's Board of Directors.

8. Defendant Hassan Ahmed is, and was at all relevant times during the Class Period, the Chief Executive Officer and President of Sonus, as well as a member of the Board of Directors.

9. Defendant Stephen Nill is – and was, at all relevant times during the Class Period – the Chief Financial Officer of Sonus.

10. Defendants Gruber, Ahmed, and Nill are sometimes hereinafter referred to as the "Individual Defendants."

11. As senior executive officers and/or directors of Sonus, the Individual Defendants had a duty to disseminate accurate and truthful information regarding the Company's financial statements and to correct any previously issued statements that had become untrue so that the market price of Sonus' securities would be based upon truthful and accurate information.

12. The Individual Defendants, by reason of their executive and/or directorial positions at Sonus, were controlling persons of the Company and had the power and influence, and exercised the same, to cause the Company to engage in the conduct complained of herein. The Individual Defendants controlled the contents of the Company's SEC filings, corporate reports and press releases. Each of the Individual Defendants participated in writing or reviewing Sonus' corporate reports, press releases, and SEC filings alleged to be misleading and thus had the ability and opportunity to prevent their issuance or cause them to be corrected.

13. Because of their positions and access to material non-public information available to them, these defendants knew that the adverse facts specified herein had not been disclosed to and were

being concealed from the public and that the positive representations which were being made were then materially false and misleading. Thus, each of the Individual Defendants is legally responsible for the falsification of Sonus' public reports, financial statements, and press releases detailed herein as "group-published" information.

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Class (excluding defendants, the members of the Individual Defendants' immediate families, their heirs, successors and assigns).

15.     Members of the Class are so numerous that joinder of all members is impracticable. As of October 31, 2003, there were 244,452,000 outstanding shares of the Company's common stock, which is listed on the NASDAQ. There are thousands of members of the Class, dispersed throughout the United States, thereby making joinder of all its members impracticable. The number of Class members and their addresses is currently unknown to the plaintiff but can be ascertained from the books and records of Sonus.

16.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the members of the Class have sustained damages because of defendants' unlawful activities alleged herein. Plaintiff has no interests which are contrary to, or in conflict with, those of the Class he seeks to represent.

17.     Plaintiff has retained counsel competent and experienced in class and securities litigation, and intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff.

18.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the federal securities laws as alleged herein;

(b)     whether defendants participated in and pursued the common course of conduct complained of; and

(c)     whether plaintiff and the Class have sustained damages and the appropriate measure thereof.

## FRAUD ON THE MARKET

20.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations and/or omitted material facts during the Class Period, as alleged herein;

(b)     The misrepresentations and/or omissions were material;

(c)     Sonus securities were traded in an efficient market;

(d)     The misrepresentations and/or omissions alleged induced the securitiesket

s and

reasona

ble

investor

s to

misjudg

e the

value of

Sonus

securiti

es; and

(e)    Plaintiff and the other members of the Class acquired Sonus securities between the time defendants made the misrepresentations or omissions and the time the truth was revealed, during which time the price of Sonus securities was inflated by defendants' misrepresentations and omissions.

21.    Based upon the foregoing, plaintiff and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for purposes of class certification, as well as for ultimate proof of the claims on the merits.  Similarly, plaintiff and the other members of the Class are entitled to a presumption of reliance with respect to the omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

22.    Prior to and during the Class Period, defendants caused Sonus to issue numerous press releases and file quarterly reports with the SEC, touting the Company's increasing quarterly revenues, while describing the Company's revenue recognition policies.  However, unbeknownst to the market,

Sonus was improperly recognizing revenue from certain customer transactions in violation of Generally

Accepted Accounting Principles ("GAAP") and its own stated policies, and thereby materially inflating

its reported revenues and income.

23.    On January 22, 2003, Sonus issued a press release announcing its financial results for

fiscal 2002, stating that:

> WESTFORD, Mass., January 22, 2003 – Sonus Networks, Inc.
> (Nasdaq: SONS), a leading provider of voice infrastructure solutions
> for the new public network, today reported its financial results for its
> fourth quarter and fiscal year ended December 31, 2002, in
> accordance with U.S. generally accepted accounting principles
> (GAAP).
>
> Revenues for the fourth quarter of fiscal 2002 were $12.7 million
> compared with $38.9 million in the same period last year. Net loss for
> the fourth quarter of fiscal 2002 was $12.8 million or $0.07 per share
> compared with a net loss for the fourth quarter of fiscal 2001 of $13.4
> million or $0.07 per share.
>
> Revenues for fiscal year 2002 were $62.6 million compared with
> $173.2 million for fiscal year 2001.

24.    On March 19, 2003, defendants caused the Company to file its Form 10-K for fiscal

year-end and fourth quarter of 2002, which republished the Company's financial results first reported in

the January 22, 2003press release. The Form 10-K, signed by defendants Ahmed and Nill, stated as

follows with respect to Sonus' revenue recognition policy:

> Sonus recognizes revenue from product sales to end users, resellers and
> distributors upon shipment, provided there are no uncertainties regarding
> acceptance, persuasive evidence of an arrangement exists, the sales price
> is fixed or determinable and collection of the related receivable is
> probable. If uncertainties exist, Sonus recognizes revenue when those
> uncertainties are resolved. In multiple element arrangements, in
> accordance with Statement of Position 97-2 and 98-9, Sonus uses the

residual method when vendor-specific objective evidence does not exist
for one of the delivered elements in the arrangement. Service revenue is
recognized as the services are provided. Revenue from maintenance and
support arrangements is recognized ratably over the term of the contract.
Amounts collected prior to satisfying the revenue recognition criteria are
reflected as deferred revenue. Warranty costs are estimated and recorded
by Sonus at the time of product revenue recognition.

25.    On April 9, 2003, defendants caused Sonus to issue a press release announcing its

financial results for the first quarter ended March 31, 2003.  The press release stated:

> WESTFORD, Mass., April 9, 2003 –Sonus Networks, Inc. (Nasdaq:
> SONS), a leading provider of voice infrastructure solutions for the new
> public network, today reported its financial results for the first quarter
> ended March 31, 2003, in accordance with U.S. generally accepted
> accounting principles (GAAP).
>
> Revenues for the first quarter of fiscal 2003 were $16.0 million compared
> with $12.7 million in the fourth quarter of fiscal 2002. Net loss for the first
> quarter of fiscal 2003 was $4.4 million or $0.02 per share compared with
> a net loss for the fourth quarter of fiscal 2002 of $12.8 million or $0.07
> per share. Revenues for the first quarter of fiscal 2002 were $21.2 million
> and the net loss for the first quarter of fiscal 2002 was $16.2 million or
> $0.09 per share.
>
> "Our financial results for the first quarter reflected good progress toward
> our business objectives," said Hassan Ahmed, president and CEO, Sonus
> Networks. "We grew our revenues 27 percent over last quarter, and by
> continuing to manage our business with precision, we further narrowed our
> net loss. In Q1, we also continued to add new customers around the globe
> and made important additions to our product family."

26.    On April 22, 2003, the Company announced that it had completed a public offering of

20 million shares of common stock at a per share price of $3.05, raising $61 million.

27.    On May 9, 2003, defendants caused the Company to file its Form 10-Q for the fiscal

2003 first quarter which republished the Company's financial results first reported in the March 19,

2003 press release. The Form 10-Q, signed by defendant Nill, assured investors that the Company's:

> [U]naudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.

28.    In addition, the Form 10-Q disclosed Sonus' revenue recognition policy:

> Revenue Recognition.    We recognize revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, we recognize revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, we use the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue.

## The False and Misleading Statements

29.    On June 5, 2003, defendant Ahmed was interviewed on CNN Financial News. During the interview, defendant Ahmed highlighted the Company's recent financial results and the discussed the Company's rapidly climbing stock price:

> AHMED: Well, a few things are happening, Joya. The - we've definitely shown growth sequentially both on the top line and improvement on the loss for the last couple of quarters. And certainly we've guided up for this quarter and that's driven, to a large extent, by the fact that our market has developed to the point where we re now

seeing adoption by some of the large incumbent (ph) carriers. That's driving our numbers certainly.

We re also seeing a re-emergence, if you will, of some of our earlier customers expanding their networks. And just in general, as we see carriers rationalizing their capital budgets, they are rotating some of their capital budget away from the legacy networks and more towards building IP oriented networks, particularly on the voice side. So that's helping us.

And then there are a number of market catalysts in terms of deregulation, for example, in the U.S. with 271 relief that s a catalyst for building out additional infrastructure. \

* * *

DASS: Your stock price has seen an amazing run. We were just putting up the chart there a few minutes ago. What are going to be the key drivers to keep that momentum going?

AHMED: Well, as I said, I think the - we re approaching certainly 2003 with an awful lot of confident because we re-seeing not only a transition of the way people are - way carriers are spending their capital towards the types of things that we do, but we re also seeing a much broader customer base looking at deploying or moving forward with deployment of this technology. So we see a broader set of carriers moving forward. We see - we see capital being devoted to this.

And we, in general, find that every - ultimately every carrier in the world is going to make a transition to packet-oriented network. This is the way networks of the future will be built. Some of them have already voted and started down this path with us and we feel that there are a lot more to follow. So I think the catalysts are very strong for people building out this infrastructure.

VELSHI: Hassan Ahmed, thanks for joining us, good to talk to you.

AHMED: Twas great talking to you. Thanks for having us

30.    Sonus' stock price closed on June 5, 2003, at $5.27 per share.

31.    On July 10, 2003, Sonus issued a press release announcing its financial results for the

second quarter of fiscal 2003 ended June 30, 2003, stating:

> WESTFORD, Mass., July 10, 2003 – Sonus Networks, Inc. (Nasdaq:
> SONS), a leading provider of voice infrastructure solutions for the new
> public network, today reported its financial results for the second quarter
> ended June 30, 2003.
>
> Revenues for the second quarter of fiscal 2003 were $21.4 million
> compared with $16.0 million for the first quarter of fiscal 2003 and $21.3
> million for the second quarter of fiscal 2002. Net loss for the second
> quarter of fiscal 2003 was $3.2 million or $0.01 per share compared with
> a net loss for the first quarter of fiscal 2003 of $4.4 million or $0.02 per
> share and a net loss of $17.8 million or $0.09 per share for the second
> quarter of fiscal 2002.
>
> Revenues for the first six months of fiscal 2003 were $37.4 million
> compared with $42.5 million in the same period last year. Net loss for the
> first six months of fiscal 2003 was $7.6 million or $0.04 per share
> compared with a net loss for the first six months of fiscal 2002 of $34.0
> million or $0.18 per share.
>
> "We are pleased with the progress that we made in the second quarter,
> particularly with our 33% sequential revenue growth," said Hassan
> Ahmed, president and CEO, Sonus Networks. "We executed across all
> areas of the business – broadening and strengthening our customer base,
> expanding our leading product offering, bolstering our balance sheet and
> advancing our drive to profitability."

32.    On August 14, 2003, defendants caused the Company to file its Form 10-Q for the

fiscal 2003 second quarter which republished the Company's financial results first reported in the

Company's July 10, 2003 press release. The Form 10-Q, signed by defendant Nill, assured investors

that the Company's:

> [U]naudited condensed consolidated financial statements have been
> prepared by Sonus and reflect all adjustments, consisting only of normal
> recurring adjustments that in the opinion of management are necessary

for a fair statement of the results for the interim periods. The unaudited
condensed consolidated financial statements have been prepared in
accordance with the regulations of the Securities and Exchange
Commission (SEC), and omit or condense certain information and
footnote disclosures pursuant to existing SEC rules and regulations.

33.    In addition, the Form 10-Q disclosed Sonus' revenue recognition policy:

Revenue Recognition.    We recognize revenue from product sales to
end users, resellers and distributors upon shipment, provided there are
no uncertainties regarding acceptance, persuasive evidence of an
arrangement exists, the sales price is fixed or determinable and
collection of the related receivable is probable. If uncertainties exist, we
recognize revenue when those uncertainties are resolved. In multiple
element arrangements, in accordance with Statement of Position 97-2
and 98-9, we use the residual method when vendor-specific objective
evidence does not exist for one of the delivered elements in the
arrangement. Service revenue is recognized as the services are
provided. Revenue from maintenance and support arrangements is
recognized ratably over the term of the contract. Amounts collected
prior to satisfying the revenue recognition criteria are reflected as
deferred revenue.

34.    On September 23, 2003, defendants took advantage of the Company's inflated stock

price and raised $131 million by selling to the public 17 million shares of common stock at a per share

price of $7.75. The offering was made pursuant to an April 22, 2003 Prospectus Supplement to a

Prospectus dated June 25, 2001. The April 22, 2003 Prospectus incorporated by reference the

Company's financial statements as contained in its SEC filings.

35.    On October 8, 2003, defendants caused the Company to issue a press release

announcing its financial results for the third quarter of fiscal 2003, stating:

WESTFORD, Mass., October 8, 2003 – Sonus Networks, Inc.
(Nasdaq: SONS), a leading provider of carrier packet voice infrastructure
solutions, today reported its financial results for the third quarter ended
September 30, 2003 in accordance with U.S. generally accepted

accounting principles (GAAP).

Revenues for the third quarter of fiscal 2003 were $28.6 million compared with $21.4 million for the second quarter of fiscal 2003 and $7.4 million for the third quarter of fiscal 2002. Net income for the third quarter of fiscal 2003 was $1.2 million or $0.01 per diluted share compared with a net loss for the second quarter of fiscal 2003 of $3.2 million or $0.01 per diluted share and a net loss of $21.6 million or $0.11 per diluted share for the third quarter of fiscal 2002.

Revenues for the first nine months of fiscal 2003 were $66.0 million compared with $49.9 million in the same period last year. Net loss for the first nine months of fiscal 2003 was $6.4 million or $0.03 per diluted share compared with a net loss for the first nine months of fiscal 2002 of $55.7 million or $0.30 per diluted share.

"This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth," said Hassan Ahmed, president and CEO, Sonus Networks. "Our revenues grew 34% sequentially to $28.6 million, reflecting increased market demand for packet telephony and the expanding number of customers who have adopted Sonus' solutions. We achieved an important milestone in reporting our first quarterly profit on a GAAP basis. Additionally, we bolstered our balance sheet to capitalize on the opportunity ahead, adding $126 million to our cash and marketable securities through a common stock offering in September."

36.     On November 10, 2003, defendants caused the Company to file its Form 10-Q for the

fiscal 2003 third quarter which republished the Company's financial results first reported in the press

release. The filing, signed by defendant Nill, assured investors that the Company's:

> [U]unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.