37.     In addition, the Form 10-Q disclosed Sonus' revenue recognition policy:

> Revenue Recognition.   We recognize revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, we recognize revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, we use the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue.

38.     On January 20, 2004, Sonus announced that it would postpone the release of its fiscal fourth quarter and year-end 2003 financial results pending the completion of its 2003 audit.

39.     On January 21, 2004, Legg Mason released a report, confirming the delay and quoting the Company as assuring investors that the delay was not as a result of the auditors uncovering any accounting issues:

> Sonus allowed its scheduled 4Q03 conference call to start before getting a postponement notice out on the wire last night.  Management later admitted to us that the handling of the postponement was short of ideal and that the press release notice of the postponement should have gone out before 4:45 p.m.
>
> *          *          *
>
> Management reported to us that there are no contentious issues between Sonus management and the company's auditors, rather, due to the increased scrutiny of today's environment, the auditing team has chosen to drill into the language of customer contracts – a course of action requiring more time than what management clearly believed would be needed prior to scheduling the company's earnings report and conference call.  We are taking management at their word but believe the poor handling of the release and the subsequence

postponement that ensued have raised the issue of communications expertise within the company's management team – issues we believe will have to be deal with on by management immediately.

40.     Nevertheless, based on the information provided them by Sonus, Legg Mason stated that it would "maintain[] our Buy rating and $11 target and believe that any weakness at the open created by this unusual turn of events is a buying opportunity, all else being equal. We believe the quarter, when ultimately reported officially, will prove to be a solid one."

**The True Facts Begin to be Revealed**

41.     On February 11, 2004, however, just after the market closed, Sonus shocked financial market participants when the Company announced that it has discovered improper revenue recognition practices which could affect, at least, its 2003 financial statements:

> WESTFORD, Mass., February 11, 2004 – Sonus Networks (Nasdaq: SONS) today provided additional information regarding the delay in reporting its fourth quarter and full fiscal year financial results for the year ended December 31, 2003. In connection with the year-end audit, Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods.
>
> The revenue issues identified relate to the proper timing of recognizing revenue from certain customer transactions, and not whether the sales can be recorded as revenue. For the customer transactions under review, the products have been delivered, customers are using the products in their networks and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a result of this reassessment.
>
> *          *          *

"We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company responded promptly by taking appropriate measures to address these matters. We assure our shareholders, customers and employees that our management and Board of Directors are committed to taking all necessary steps to complete our review in an expeditious and comprehensive manner, and to prevent such problems from occurring in the future."

*      *      *

At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.

37.     When the market opened on February 12, 2004, Sonus shares plummeted as low as $5.02 per share – a decline of 24.9%, or $1.67 per share – to close at $5.39 per share on volume of 96 million shares.  The Company's 52-week average for daily volume had been 7.8 million.

38.     Also on February 12, 2004, analysts from Legg Mason and Wachovia immediately downgraded Sonus stock.

**Defendants Acted With Scienter**

39.     As illustrated by the Individual Defendants' positions with the Company, they had and used their influence and control to further the scheme alleged herein.  The Individual Defendants had broad responsibilities that included communicating with the financial markets and providing the markets with financial results.  The Individual Defendants were privy to and directed the making of financial projections and results.  By making the misleading statements contained herein the Individual Defendants knew that they would artificially inflate the value of the Company's securities.  Defendants' actions in doing so resulted in damage to plaintiff and the Class.

Doc#: 140253 Ver#:1 9730:0294                       -16-

40.    As Chief Financial Officers of Sonus, defendant Nill, in conjunction with his direct supervisors, defendants Gruber and Ahmed, were responsible for the preparation of Sonus financial statements and for ensuring that the periodic reports filed with the SEC containing such financial statements complied fully with the disclosure requirements of the federal securities laws. The Individual Defendants signed and/or reviewed Sonus' SEC filings containing the Company's financial results, as alleged herein. Because the recognizing revenue that is not both earned and realized or realizable is a departure from the general rule of GAAP (see FASB Statement of Concepts No. 5, ¶ 83), the Individual Defendants – persons responsible for preparation and filing of Sonus' financial statements – had the responsibility to verify underlying facts of any publicly released financial statements.

41.    The Defendants were motivated, in part, to materially misrepresent Sonus' results in order to cause and maintain an artificial inflation in the price of Sonus common stock, which was used during the Class Period to raise additional cash proceeds for the Company. Specifically, on September 23, 2003, defendants took advantage of the Company's inflated stock price and raised $131 million by selling to the public 17 million shares of common stock at a per share price of $7.75. The shares were sold pursuant to a Prospectus and shelf registration statement.

42.    As further evidence of scienter, prior to Sonus' February 11, 2004 disclosure and during the Class Period, Company insiders sold over 250,000 of their own Sonus stock for approximately $2 million. For example, Edward Anderson (Director) made two sales on July 18, 2003, for a total of approximately $448,000; Edward Harris (vice-president) made one sale on the same day for a total of approximately $200,000; John O'Hara (vice-president) made three trades on both July 22, 2003 and October 22, 2003, for a total of $489,612; and Paul Jones (vice-president)

made one sales on October 10, 2003, for a total of approximately $850,000.

43.     In sum, defendants acted with scienter in that they knew or recklessly disregarded that

the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew or recklessly disregarded that such statements or documents

would be issued or disseminated to the investing public; and knowingly or recklessly and substantially

participated or acquiesced in the issuance or dissemination of such statements or documents as primary

violations of the federal securities laws.  As set forth herein, defendants acted with a knowing or

conscious disregard for the falsity of Sonus' financial statements.

## STATUTORY SAFE HARBOR

44.     The statutory safe harbor providing for forward-looking statements under certain

circumstances does not apply to the allegedly false statements pleaded herein.  The allegations concern

misrepresentations of historical facts and are not forward-looking.  Further, even if the statements

pleaded were forward-looking, they were not identified as a "forward-looking statement" when made.

Nor did meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from that in the forward-looking statement accompanying such statement.  To the

extent that the statutory safe harbor does apply to any statement pleaded, the Defendants are liable for

those false forward-looking statements because at the time each of those statements was made the

speaker actually knew the statement was false and the statement was authorized and/or approved by an

executive officer of Sonus who actually knew that those statements were false when made.

## COUNT I

## AGAINST ALL DEFENDANTS FOR
## VIOLATION OF §10(b) OF THE 1934 ACT AND RULE 10b-5

45.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

46.     This Count is asserted against all defendants and is based upon §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission.

47.     During the Class Period, defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme, and unlawful course of conduct and conspiracy, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, conspiracy, and unlawful course of conduct was to induce plaintiff and the other members of the Class to purchase Sonus securities during the Class Period at artificially inflated prices, and to allow certain Company insiders to sell their holdings at inflated prices.

48.     During the Class Period, defendants, pursuant to said scheme, plan, conspiracy, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the preparation and issuance of deceptive and materially false and misleading statements to the investing public which were contained in or omitted from various documents and other statements, as

particularized above.

49.    Defendants each knew and intended to deceive plaintiff and the other members of the Class, or in the alternative, acted with reckless disregard for the truth when they failed to disclose or cause the disclosure of the true facts to plaintiff and the other members of the Class.

50.    As a result of the dissemination of the false and misleading statements set forth above, the market price of Sonus securities were artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied to their detriment on the integrity of the market price of the stock in purchasing Sonus securities. Had plaintiff and the other members of the Class known of the materially adverse information misrepresented or not disclosed by defendants, they would not have purchased Sonus securities at the artificially inflated prices that they did.

51.    As a result of the inflation of the price of Sonus securities during the Class Period caused by defendants' material misrepresentations and omissions, plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs alleged.

52.    By reason of the foregoing, defendants, directly or indirectly, violated the 1934 Act and Rule 10b-5 promulgated thereunder in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, and a course of business which operated as a fraud and deceit and a scheme to defraud upon plaintiff and the other members of the Class in connection with their purchases of Sonus securities during the Class Period.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR
### LIABILITY PURSUANT TO §20(a) OF THE 1934 ACT

53.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if set forth fully herein.

54.     The Individual Defendants, by virtue of their offices and specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of Sonus within the meaning of §20(a) of the 1934 Act.

55.     The Individual Defendants had the power and influence and exercised the same to cause Sonus to engage in the illegal conduct and practices complained of herein.

56.     By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of Sonus securities during the Class Period.

## JURY DEMAND

57.     Plaintiff demands a trial by jury on all issues.

**WHEREFORE,** plaintiff, on behalf of himself and the members of the Class, prays for judgment as follows:

(a)  declaring this action to be a proper class action and certifying plaintiff as the representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

(b)  awarding compensatory damages in favor of plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

(c)  awarding plaintiff and the other members of the Class punitive damages against all defendants, jointly and severally, on the common law claim for fraud and deceit;

(d)  awarding plaintiff and the Class their costs and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys, accountants, and experts, and reimbursement of plaintiff's expenses; and

(e)  granting such other and further relief as the Court may deem just and proper.

Dated:  February 13, 2004

By his attorneys,

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
SHAPIRO, HABER & URMY
75 State Street
Boston, Massachusetts 02109
617.439.3939

WOLF POPPER LLP
Marian P. Rosner
Michael A. Schwartz
Renee L. Karalian
845 Third Avenue
New York, New York  10022
212.759.4600

*Attorneys for Plaintiff*

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

Peter Kaltman hereby states that:

1.      I have reviewed the Complaint against Sonus Networks, Inc. ("Sonus"), and certain of its senior officers and directors – in the action styled Kaltman v. Sonus Networks, Inc., et al. – and have authorized the filing of the Complaint.

2.      I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period alleged in the Complaint, I made the following transactions in Sonus' common stock:

| Buy or Sell | Trade Date | No. of Shares | Price Per Share |
|---|---|---|---|
| Buy | 07/23/03 | 270 | 7.228 |
| Buy | 08/19/03 | 175 | 6.564 |
|  |  | 445 |  |

5.      During the three-year period preceding the date of my signing this Certification, I have sought to serve as a representative on behalf of a class in the following two private actions arising under the federal securities laws:

Kaltman, v. Scientific Atlanta, Inc., James F. McDonald, and Wallace G. Haislip, Civil Action No. 1:01-CV-1977, N.D. Georgia, Atlanta Division; and

Kaltman v. Nicor, Inc., Thomas L. Fisher, and Kathleen Halloran, Civil Action No. 02-C-5239, N.D. Illinois, Eastern Division.

6.      I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages relating to the representation of the Class.

7.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12 day of February 2004.

By: _____
                    Peter Kaltman